# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BELMONT PARTNERS, LLC,<br>*Plaintiff,*<br><br>v.<br><br>CHINA YIBAI UNITED GUARANTEE<br>INTERNATIONAL HOLDING, INC.,<br>*Defendant.* | CASE NO. 3:10-cv-00020<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

Plaintiff Belmont Partners, LLC ("Belmont") brought this suit for breach of contract against Defendant China YiBai United Guarantee International Holding, Inc. ("China YiBai"), seeking compensatory damages. Upon Belmont's motion for summary judgment, I ruled that China YiBai had breached the contract between the parties, but that a genuine issue of material fact remained as to the amount of damages. The issue of damages was tried to the Court without a jury on January 18, 2011.

As set forth herein, I find that Belmont has not met its burden to prove compensatory damages, and I award Belmont no compensatory damages. Belmont is entitled to $1.00 in nominal damages for the breach of contract.

## I.

I make the following findings of fact.

Belmont is a Virginia limited liability company with its principal place of business in Virginia. All of Belmont's members reside in and are citizens of Virginia. Belmont purchases struggling public companies, settles their outstanding obligations, and then sells the controlling

interest in them to private companies that desire to use the public companies as vehicles to go public themselves.

On or about April 30, 2009, Belmont and IG Finance Investment, Inc. ("IG Finance") entered into a Stock Purchase Agreement ("Agreement") pursuant to which IG Finance agreed to purchase and Belmont agreed to sell Belmont's 52.51 percent interest in SpectraSource, Inc., a public, Nevada corporation. The 52.51 percent interest is equivalent to 8,000,000 common shares of capital stock in SpectraSource. The Agreement stipulated that after the interest was transferred, SpectraSource would complete a reverse merger with IG Finance. In exchange for the controlling interest in SpectraSource, IG Finance agreed to pay Belmont $115,000 and, upon closing of the reverse merger, to transfer shares in an amount equal to a five percent interest in the post-merger company. It was understood that those shares would be unregistered, "restricted" stock as governed by Rule 144 of the Securities and Exchange Commission, 17 C.F.R. § 230.144, and Rule 144A, 17 C.F.R. § 230.144A. The restricted stock in this matter is subject to a one-year holding period during which it cannot be sold on the public market, unless to qualified institutional buyers. *See* 17 C.F.R. §§ 230.144 and 230.144A; *Holman v. Comm'r*, 601 F.3d 763, 773 (8th Cir. 2010). Restricted stock can be sold in a private sale. *See United States v. Roush*, 466 F.3d 380, 386 (5th Cir. 2006).

The sale of Belmont's interest in SpectraSource and the reverse merger were completed on or about June 27, 2009, and the post-merger company was renamed China YiBai United Guarantee International Holding, Inc. China YiBai is the successor in interest to IG Finance and is a Nevada corporation. China YiBai has over 130 million shares of stock issued and outstanding.

Upon closing of the reverse merger, China YiBai did not transfer to Belmont the five percent interest in China YiBai, which totaled 6.6 million shares. This suit was instituted on May 10, 2010, to recover compensatory damages. On November 10, 2010, China YiBai issued a stock certificate for 6.6 million shares of China YiBai stock, and Belmont received the certificate on or about November 16, 2010.[1] On summary judgment I held that the failure to transfer the 6.6 million shares to Belmont "on June 27, 2009 or as soon as practical thereafter" constituted a breach of contract, and tried the issue of damages.

China YiBai stock is not traded on any exchange. Rather, its stock sells over the counter, and is reported in the "Pink Sheets" under the trading symbol CBGH. The Pink Sheets is a "financial service that reports information about over the counter securities trading and issuers." *Kaplan v. First Hartford Corp.*, 603 F. Supp. 2d 195, 197 n.3 (D. Me. 2009). "The domestic companies listed on the Pink Sheets tend to be closely held, extremely small and/or thinly traded." *Id.* (quotations omitted). The Pink Sheets does not report information about private sales of stock.

At trial, Belmont submitted into evidence a record of the Pink Sheets on the China YiBai and SpectraSource stock from the period of November 19, 2008 to January 14, 2011; prior to June 27, 2009, the date of the reverse merger, the record contains information about SpectraSource stock and is irrelevant to the instant matter. For each date, the Pink Sheets disclose the opening and closing share price, the high and low share price, and the volume of shares traded that day. The Pink Sheets reveal that there were no public trades of China YiBai stock on June 27, 2009. The first public trade of China YiBai stock did not occur until September 8, 2009, when 100 shares were traded at a price of $1.10 per share. This was the only

---

[1] The certificate is dated November 10, 2010 and states on its face that the shares are unregistered. Belmont's general counsel testified that although the restriction on the stock can be removed because Belmont earned the stock over a year ago, the process for removing the restriction is a "compliance nightmare."

day of trading of China YiBai stock in the first three months following the merger. In the next three months (Sept. 27 to Dec. 26), stock was traded on seven additional days, with 4,679 total shares traded at prices varying from a low of $0.55 per share to a high of $1.10 per share, and an average share price of approximately $0.89 per share.[2] In the next three months (Dec. 27 to Mar. 26), representing the period from six to nine months after the merger, eleven days of trading occurred, with 14,892 total shares traded at prices varying from a low of $0.55 per share to a high of $2.50 per share, and an average share price of approximately $1.43 per share. An increase in the volume of trading occurred in the final three months of the year after the merger (Mar. 27 to June 26), when 51,916 total shares traded on twenty-eight days of trading at prices varying from a low of $0.55 per share to a high of $3.10 per share, and an average share price of approximately $1.92 per share. In total, in the year after Belmont was supposed to receive its shares, the China YiBai stock traded on forty-seven days, with 71,587 shares traded at an average price of approximately $1.64.

In the next three months (June 27 to Sept. 26), the volume of trading fell to 18,260 shares on twenty-two trading days, with prices varying from a low of $0.55 per share to a high of $1.98 per share, and an average share price of approximately $1.15 per share. In the next three-month period (Sept. 27 to Dec. 26), during which Belmont received the 6.6 million shares, trading fell off to only 2,903 shares traded on eight trading days, from a low of $0.20 per share to a high of $1.05 per share, and an average share price of approximately $0.76 per share. On November 16, 2010, the date when Belmont received its shares, three hundred shares traded at a price of $0.25 per share. The trades closest in time to that trade occurred on November 1, when 200 shares

---

[2] Neither party offered a method for determining the average share price. I calculate the daily average share price by taking the average of the high and low prices on each day shares were traded. The average share price over a period of time is the average of the daily average share prices on days that shares were traded. I exclude prices quoted for days on which no trades occurred.

were traded at $1.05 per share, and on December 2, when 300 shares traded from $0.59 per share to $1.05 per share.

Belmont did not offer an expert to testify as to the valuation of the China YiBai stock. Chris Dobbins, the chief operating officer and general counsel of Belmont, testified as a layperson on behalf of Belmont. Mr. Dobbins described the market for China YiBai stock as "brutally efficient" and appeared to rely on the prices set forth in the Pink Sheets as an accurate gauge of the stock price, without explicitly commenting on the reliability of the Pink Sheets. Mr. Dobbins conveyed that the share price depends on the volume of shares being traded. Flooding the public market with shares may "crush the share price," according to Mr. Dobbins.

Mr. Dobbins testified that Belmont could have sold at least 92,150 shares during the period from June 27, 2009 to November 16, 2010 *in addition to* the 92,150 shares that actually sold during that period, at the average price per share over that period of time. Mr. Dobbins determined that the average share price over this period was $1.25 per share. He stated that Belmont could have sold more than 92,150 shares, but that he could not say at what price because he could not estimate how the market price would react to an increase in the volume of shares offered in an amount more than double the number of shares actually traded. Specifically, Mr. Dobbins testified that between April and September of 2010, the volume of trading was large enough for Belmont to sell shares in the public market, and that Belmont would have attempted to do so. He stated that Belmont could have sold at least the same number of shares that were trading during that period, at the price at which they were trading. Although he did not figure it into his calculations, Mr. Dobbins testified that between April and September of 2010, Belmont "could have potentially" sold a "smaller block" of stock to private buyers.

When asked about the price of the stock on June 27, 2009, Mr. Dobbins stated that it was not possible to "pinpoint precise stock price" on that date because no stock was sold then. He added that Belmont would value those shares by looking at the price they last sold at immediately before that date and the price they sold at immediately following that date. He did not provide an estimate of the price of the stock on June 27, 2009. He testified that the price of the stock when Belmont received the 6.6 million shares was $0.25 per share.

Mr. Dobbins acknowledged that the shares Belmont was supposed to receive would have been unregistered and subject to a one-year holding period. He stated that Belmont has sold restricted shares to certain accredited investors and institutional buyers in the past. No institutional buyers, however, approached Belmont about purchasing China YiBai stock.

Defendant China YiBai was barred from presenting evidence on its behalf because it violated a discovery order dated October 28, 2010 (docket no. 28).

## II.

The jurisdiction of the Court is based on diversity of citizenship. The Agreement at issue contains a provision for the application of the law of the state of New Jersey. When determining choice of law issues, a federal court sitting in diversity applies the law of the forum state in which it sits. *Sokolowski v. Flanzer*, 769 F.2d 975, 977 (4th Cir. 1985) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941)). Forum selection clauses are generally enforced by federal courts, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 13 (1972), as well as in Virginia, *Paul Bus. Sys. v. Canon U.S.A., Inc.*, 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990). Accordingly, New Jersey law applies to this case.

A party bringing a claim for breach of contract has "the burden of proof to establish all elements of its cause of action, including damages." *Cumberland Cnty. Improvement Auth. v.*

*GSP Recycling Co.*, 358 N.J. Super. 484, 503, 818 A.2d 431, 442, (App. Div. 2003). As a general proposition governing the calculation of compensatory damages, the innocent party ought to be put in as good a position as he would have been had the breaching party performed the contract in accordance with its terms. *See Totaro, Duffy, Cannova & Co. v. Lane, Middleton & Co.*, 191 N.J. 1, 12-13, 921 A.2d 1100, 1107 (2007).

While a plaintiff "should not be denied compensation merely because the exact amount of damages is uncertain," the record "must support a reasonable estimate of damages, based upon more than mere speculation." *McConkey v. Aon Corp.*, 354 N.J. Super. 25, 58, 804 A.2d 572, 592 (App. Div. 2002); *see also Borough of Fort Lee v. Banque Nat'l de Paris*, 311 N.J. Super. 280, 291, 710 A.2d 1, 6 (App. Div. 1998) (same); *Am. Sanitary Sales Co. v. State, Dep't of Treasury*, 178 N.J. Super. 429, 435-36, 429 A.2d 403, 406 (App. Div. 1981) (stating that while "[i]t would be a travesty to deny a plaintiff essential justice because the absence of means for precision precludes perfect justice," the fact finder may not engage in "mere speculation"). "[W]here it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Am. Sanitary Sales*, 178 N.J. Super. at 435, 429 A.2d at 406 (quoting *Tessmar v. Grosner*, 23 N.J. 193, 203, 128 A.2d 467, 472 (1957)). "Evidence affording a basis for estimating damages with some reasonable degree of certainty is sufficient to support an award of compensatory damages." *Id.* (quoting *Paolicelli v. Wojciechowski*, 132 N.J. Super. 274, 278-279, 333 A.2d 532, 534 (App. Div. 1975)). The plaintiff must prove damages "with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." *Totaro, Duffy, Cannova & Co.*, 191 N.J. at 14, 921 A.2d at 1108.

The parties are unable to agree on which theory of damages should be applied to determine the amount of compensation due Belmont for the delay of nearly seventeen months in the delivery of stock. Belmont urges the Court to follow the "breach of contract theory" of damages employed in *First National Bank of Chicago v. Jefferson Mortgage Co.*, 576 F.2d 479 (3d Cir. 1978). In that case, applying New Jersey law, the court measured damages for a broker's repudiation of a contract to sell mortgage securities as "the difference between the market price at the time when the buyer learned of the breach and the contract price . . . less expenses saved in consequence of the seller's breach." *Id.* at 490 (quoting N.J.S.A. § 12A:2-713).[3] Investment securities, such as the mortgage securities in *First National Bank* or the stock in the instant matter, are governed by Article 8 of the New Jersey Uniform Commercial Code ("UCC"). Although N.J.S.A. § 12A:2-105 expressly excludes securities from the coverage of Article 2, which regulates the sale of goods, the official comment to § 12A:2-105 states that the exclusion was not intended "to prevent the application of a particular section of [Article 2] by analogy to securities . . . when the reason of that section makes such application sensible and the situation involved is not covered by [Article 8]." N.J.S.A. § 12A:2-105 cmt. 1. Because Article 8 does not provide for a buyer's remedy against a seller for breach of contract to purchase securities, the court in *First National Bank* reasoned that it was logical to apply § 12A:2-713 of Article 2, which provides for a buyer's damages for non-delivery or repudiation, by analogy to

---

[3] Section 12A:2-713 provides as follows:

Buyer's damages for non-delivery or repudiation

(1) Subject to the provisions of this Chapter with respect to proof of market price (12A:2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Chapter (12A:2-715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Case 3:10-cv-00020-NKM-BWC   Document 46   Filed 02/16/11   Page 8 of 17   Pageid#: 222

determine the damages due the buyer for the breach. *First Nat'l Bank*, 576 F.2d at 490; *see also Buford v. Wilmington Trust Co.*, 841 F.2d 51, 56 (3d Cir. 1988) (under identical Pennsylvania UCC § 2-713, court analogized breach of contract due to non-delivery of securities to sale of goods and formulated damages by the market value on date securities should have been delivered). In an action for the non-delivery of stock where there is no contract price, damages under § 12A:2-713 become simply the market value on the date the buyer learned of the breach. *See Buford*, 841 F.2d at 56.

The "breach of contract theory" treats a breach of contract to sell stock in the same way as a breach of contract to sell goods. It presumes that the injured party has the ability to "cover," in other words, to "mitigate damages by protecting prospective profit," and puts the onus on the injured party to cover immediately upon the breach because damages are fixed as of the breach date. *Scully v. US WATS, Inc.*, 238 F.3d 497, 510 (3d Cir. 2001). It does not allow an injured party to recover any prospective profit that may have accrued after the wrongful act. *Id.* It merely awards the buyer the "benefit of his bargain" made with the seller. *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 12, 860 A.2d 435, 442 (2004).

The New Jersey Supreme Court used a breach of contract approach to ascertain a seller's damages where a buyer refused to accept delivery of stock from a seller. *Crichfield-Loeffler, Inc. v. Taverna*, 4 N.J. Misc. 310, 132 A. 494 (N.J. 1925) (per curiam) (pre-UCC). The court held that the contract for the sale of stock was controlled by the law pertaining to the sale of goods, and measured damages by "the difference between the contract price and the market or current price when the goods ought to have been accepted." *Id.* at 312, 132 A. at 495. Because the evidence did not show that the contract price for the stock was different from the market price, the court awarded only nominal damages. *Id.* at 313, 132 A. at 495-96.

The defendant China YiBai does not propose an alternative method for calculating damages. *First National Bank* and *Crichfield-Loeffler*, together with consideration that the UCC permits use of a sale of goods measure for a breach of contract involving securities, indicate that New Jersey courts would measure the non-delivery of stock by the market price of the stock at the time the buyer learned of the breach. Therefore, upon Belmont's request, I will calculate damages in accordance with N.J.S.A. § 12A:2-713.[4] When determining the market price, if evidence of a price prevailing at the time the buyer learned of the breach is not readily available, the court may consider the "price prevailing within any reasonable time before or after the time described." N.J.S.A. § 12A:2-723(2). Of course, once the value of stock at the time the buyer learned of the breach is determined, the value of the stock at the time it was actually delivered to Belmont (albeit late) must be subtracted.

### III.

The task of particularizing damages in this case is rather difficult because of the lack of a robust market for China YiBai stock. The Pink Sheets report shows that over the period between the date of the merger and the date Belmont received the shares of stock, trading has been infrequent (seventy-three days of trading over a period of almost seventeen months), the volume of stock traded has been thin (on average, less than 1,300 shares sold per day of actual trading), and the price of the stock has been extremely volatile (varying from $0.20 per share to $3.10 per share). Compounding those concerns is the problem of valuing a relatively large number of shares (6.6 million shares) as compared to the small volume of trading over the period (92,150 total shares traded). Basic principles of economics teach that, in general, an increase in the

---

[4] In the alternative, Belmont proposes that the Court measure damages based on the highest price of the stock in the market between the date of the breach and the date the stock was received. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law 2.) But this proposal is based on the misconception that Virginia law may apply to this matter. Belmont agrees that under New Jersey law, the formula set forth in N.J.S.A. § 12A:2-713 controls. (*See id.* at 3.)

quantity of a good being sold causes a decrease in its price. *See Amerada Hess Corp. v. Comm'r*, 517 F.2d 75, 84 n.33 (3d Cir. 1975) ("Selling off a very large block of shares which are identical to all other such shares available on the market creates a supply in excess of demand. It is widely accepted that the market quotation of such shares should be reduced to compensate for this price-depressing effect. The reduction is referred to as a 'blockage discount.'"). Further complicating the determination of a market price is that the prices listed on the Pink Sheets are of registered, unrestricted shares of stock, whereas Belmont contracted for restricted shares of stock, the marketability of which are severely limited during the one-year holding period. *See Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 300 (3d Cir. 1991) (unregistered stock's lack of transferability "will have an impact on its value"). In sum, the Pink Sheets quotes supplied by Belmont fail to remove considerable uncertainty about the market price of the stock in question. *See In re HPL Techs., Inc. Sec. Litig.*, 366 F. Supp. 2d 912, 918 (N.D. Cal. 2005) (describing the price of stock listed in Pink Sheets as an "illusion" because of stock's illiquidity and volatility).

To account for the limitations in the Pink Sheets prices, Belmont proposes that the Court modify the breach of contract rule to measure damages by "the difference between (a) the market price at the time of breach *or at a reasonable time thereafter when the shares could have been resold*, and (b) the contract price (here $0)." (Pl.'s Proposed Findings of Fact and Conclusions of Law 6) (emphasis added). To determine the market price at a reasonable time after the breach when the shares could have been resold by the innocent party, Belmont suggests that the Court consider the total number of shares that Belmont *could have sold* in the market during the period from the date of the merger to the date Belmont received the shares, *i.e.*, the period when Belmont should have had the stock but did not because of China YiBai's breach, at the average price per share over this period. Belmont argues, based on the testimony of Mr. Dobbins, that

the number of shares it could have sold is, at minimum, the number of shares that were traded during that period: 92,150 shares. Mr. Dobbins testified that the average price per share over the period was $1.25 per share. Thus, under Belmont's modification of the breach of contract measure, Belmont is entitled to damages of at least $1.25 multiplied by 92,150, which exceeds $115,000.

There are several problems with Belmont's approach. First and foremost, the modification to the rule of damages would transform the breach of contract measure, which provides a method of estimating a cover price and explicitly does not allow recovery of prospective profits accrued after the breach, into a conversion measure, whereby the court bases damages on the innocent party's lost profits over a reasonable time after the breach. *See Scully*, 238 F.3d at 509-10 (comparing and contrasting the breach of contract and conversion theories of damages). Having decided that the breach of contract measure controls the outcome of this case (at the urging of Belmont, no less), I will not abandon that method in applying it to these facts. Under the breach of contract method, damages are fixed as of the time the buyer learned of the breach, so I will not consider losses that accrued subsequently. N.J.S.A. § 12A:2-713; *see also Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971) (holding, in case involving breach of contract for non-delivery of stock, that it was error to calculate damages by viewing innocent party as if it became the owner of the stock). Second, Belmont does not factor into its calculation the value of the stock it did receive. If I adopted Belmont's proposal, Belmont would receive the value of 92,150 shares as if it sold them, and also would be allowed to keep those 92,150 shares and sell them if desired. Finally, Belmont does not reduce the number of shares it could have sold based on their restrictions, even though Mr. Dobbins testified that the ability to sell those shares is limited during the one-year holding period.

Not only did Belmont fail to propose a measure of damages that reasonably applies the law of the case, but also it did not present any expert testimony, despite the obvious utility of the opinion of a sophisticated market analyst on an appropriate method for determining the market price of a stock that is thinly and episodically traded. Furthermore, the Court could benefit from expert testimony on the adjustments to the share price needed to compensate for the large volume of stock to be valued and for the restricted nature of the stock. *See, e.g., Amerada Hess*, 517 F.2d at 84 ("Market analysts have developed reliable techniques for determining the amount by which the market price should be adjusted to correct for various abnormalities. Where such techniques are relevant, they can be used to adapt the market price so that it sets the fair market value with considerable accuracy."); *cf. Holmes v. Bateson*, 583 F.2d 542, 563 (1st Cir. 1978) (reciting that expert calculated thirty percent reduction in market value for unregistered stock). For example, in *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 (3d Cir. 1975), the United States Court of Appeals for the Third Circuit found error in the trial court's valuation of restricted stock as part of a damages award, where the trial court based its determination on the over the counter bid and asked prices of the unrestricted stock. The Third Circuit held that without any expert testimony on the discount factor to apply to the price of the unrestricted stock, the trial court did not have sufficient evidence for ascertaining the correct discount factor itself, and remanded for further evidentiary proceedings. *Id.* at 894-95 ("It seems to us that it is better that a court weigh evidence on this matter as presented to it by experts rather than speculate as to what factors are, or can be considered."). Here, no evidence has been presented on the discount factor to apply to the market price of the unrestricted China YiBai stock.

The lay testimony that Belmont did present hardly advances its case. Mr. Dobbins did not offer an opinion on the market price of the 6.6 million shares of stock on the date of the

merger; rather, he testified that it was not possible to "pinpoint precise stock price" on that date. Nor did he determine the market price of the stock on the date Belmont received the shares, other than to recite that the Pink Sheets price of the stock on November 16, 2010 was $0.25 per share. In fact, he admitted that the prices listed on the Pink Sheets were tied to the volume of shares sold, and that he could not estimate the impact on the average market price if more than double the 92,150 shares were sold. Mr. Dobbins' testimony highlights the uncertainty in deriving a market price from the Pink Sheets quotes. In addition, I do not find his conclusion that Belmont could have sold 92,150 shares in the market at the average share price, if it had the stock, to be convincing. His lay opinion seemed to be based on a rule of thumb that the volume of shares traded over the period could have been doubled without affecting the average price over the period. While this rule is dubitable in itself, what strikes me as particularly questionable is that the 92,150 figure encompasses the entire period between the merger and the receipt of the stock, without accounting for the one-year holding period. In effect, Mr. Dobbins assumed that Belmont could have doubled the volume of shares sold in the public market during the holding period (some 37,000 shares), despite the limited transferability of the shares. That assumption is entirely unreasonable.

The significant shortcomings in the plaintiff's presentation of evidence leaves me with little guidance as to how to determine an accurate market price of the China YiBai stock on the two dates in question. I begin with the question of the value of the 6.6 million shares of unregistered China YiBai stock on the date the buyer learned of the breach, which is effectively June 27, 2009, the date of the completion of the merger. An examination of the raw market data reveals that no shares were traded publicly on June 27, 2009, and China YiBai stock did not exist prior to that date. Thus, I look to the price prevailing within a reasonable time after June 27. *See*

N.J.S.A. § 12A:2-723(2).  In the three months following the merger, only 100 shares were traded on one day, at a price of $1.10 per share.  This single transaction is insufficient to determine a market price.  If I expand the time horizon to six months from the date of the merger, I still only have eight days of trading to consider, with less than 5,000 shares sold at prices varying from $0.55 per share to $1.10 per share, and at an average share price of approximately $0.92 per share.  These isolated sales are a far cry from establishing a market price for China YiBai stock.  Based on the raw data alone, I could assume the price of China YiBai stock on June 27, 2009 falls within the range of $0.55 per share to $1.10 per share, and I could approximate it at $0.92 per share, its average price.[5]  But that is only the market price at a quantity of at most 5,000 shares.  I must ascertain the market price of 6.6 million shares, and then discount that price to correct for their lack of transferability as restricted shares.  That I cannot do without engaging in pure speculation.

I encounter the same problem when attempting to value the 6.6 million shares of China YiBai stock that Belmont actually received on November 16, 2010.  I look to the price of shares sold on that day, and within a reasonable time before and after the date of receipt.  On November 16, 300 shares traded at a price of $0.25 per share.  The trades closest in time to that trade occurred on November 1, when 200 shares traded at $1.05 per share, and on December 2, when 300 shares traded from $0.59 per share to $1.05 per share.  In light of the volatility of the price over this period and the tiny volume of shares sold, I will expand the relevant time period to the date of receipt plus the ten closest transactions.[6]  This yields an average price of $0.76 per share,

---

[5] Price data beyond six months from the merger reveals a trend toward higher prices in the sales of stock.  For example, the average share price in the period from three to six months after the breach of $0.89 per share increases to $1.43 per share for the period from six to nine months after the breach, and then to $1.92 per share for the period from nine months to one year after the breach.  The increase in price over the winter and spring of 2010 does not accurately reflect the price of the stock in June 2009, so I do not consider that data.

[6] This time period includes all sales from September 24, 2010 to January 4, 2011.  During this period, the price fluctuates dramatically between $0.20 per share and $1.05 per share.

which is the best assessment of the market price on the date of receipt at a quantity of at most 5,000 shares, based on the price data alone. To adjust that price to reflect the sale of 6.6 million shares would entail blatant conjecture.

I conclude that Belmont has not met its burden to prove damages with such certainty as to enable the fact finder to make a "fair and reasonable estimate" of damages, *Totaro, Duffy, Cannova & Co.*, 191 N.J. at 14, with "some reasonable degree of certainty" beyond "mere speculation," *Am. Sanitary Sales*, 178 N.J. Super. at 435-36. I take seriously the obligation on the fact finder to ensure "essential justice," *Am. Sanitary Sales*, 178 N.J. Super. at 435-36, but in this matter, the plaintiff has failed to provide the Court with *any* reliable method for determining damages that comports with the legal rule advocated by the plaintiff. The judiciary is not equipped to develop its own framework to divine a reliable market price from raw sales data that even the plaintiff's witness acknowledges is wanting in predictive power. *See Cumberland Cnty. Improvement Auth.*, 358 N.J. Super. at 503, 818 A.2d at 442 (holding that trial court erred in calculating damages because plaintiff failed to provide evidence of market price of goods at time in question, leaving trial court to speculate as to price); *Crichfield-Loeffler*, 4 N.J. Misc. at 313, 132 A. at 495-96 (declining to award compensatory damages for buyer's failure to accept stock where there was no evidence of difference between contract price and market price). In the absence of expert testimony or some other competent evidence, a formulation of damages would be impermissibly speculative and unsupportable.

Belmont does not go uncompensated—it has received the stock for which it contracted, which is an alternative remedy under New Jersey law "when it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty." *First Nat'l State Bank of New Jersey v. Commonwealth Fed. Sav. & Loan Ass'n*, 455 F. Supp. 464, 469-70

(D.N.J. 1978) (awarding specific performance for breach of contract to finance shopping center because the damage "simply does not lend itself to accurate evaluation") (applying New Jersey law); *see also* N.J.S.A. § 12A:2-716(1) (providing that specific performance "may be decreed where the goods are unique or in other proper circumstances"). I award Belmont nominal damages in the amount of $1.00 for the breach of contract.

## IV.

For the reasons stated herein, the Court will deny Belmont any compensatory damages and will award Belmont $1.00 in nominal damages. An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this __16th__ day of February, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE